## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SAMY FARAGALLA,** | |
| **Plaintiff,** | |
| **v.** | Civ. No. 2:17-cv-03604-KM-MAH |
| **JERSEY CITY; MORTON OTUNDO; and JOHN DOES 1-5 (fictitious individuals), members of the JERSEY CITY and/or HUDSON COUNTY SHERRIFF'S DEPARTMENT; PHILLIP ZACHE, JERSEY CITY CHIEF OF POLICE; FRANK SCHILLARI, HUDSON COUNTY SHERIFF; JOHN DOES 6-10 (fictitious individuals), personnel of the JERSEY CITY and/or HUDSON COUNTY SHERRIFF'S DEPARTMENT in supervisory capacities, ,** | **OPINION** |
| **Defendants.** | |

**MCNULTY, U.S.D.J.:**

The plaintiff, Samy Faragalla, was involved in an altercation with Jersey City police officer Morton Otundo. Faragalla seeks an action against Otundo, as well as his employer, the City of Jersey City (the "City") and its then-chief of police, Phillip Zacche. Other Defendants, related to Hudson County, are no longer party to this action. Faragalla brings various state law claims and claims pursuant to 42 U.S.C. § 1983 for violation of his constitutional rights.

Currently pending before the Court are motions for summary judgment by Otundo, the City, and Zacche to dismiss the remaining counts in the complaint against them. For the reasons herein, the motions will be granted in part and denied in part.

1

## I. Background[1]

Defendant Morton Otundo has been a member of the Jersey City Police Department since July 15, 2013. (JCSMF ¶ 12). On July 8, 2016, Officer Otundo was in full uniform working a traffic detail at the intersection of Hoboken and Oakland Avenues. (*Id.* ¶ 14). Plaintiff Samy Faragalla first encountered Officer Otundo when he attempted to continue straight through the intersection, despite being in the left lane. (*Id.* ¶ 16). Officer Otundo directed Faragalla to make a left turn, which he did. (*Id.*). Faragalla then made an illegal U-turn.[2] (*Id.* ¶ 17).

Officer Otundo then instructed Faragalla to pull over. (*Id.*). Once he did so, the two engaged in a verbal encounter, the exact contours of which are disputed. (*Id.* ¶ 18; PSSMF ¶ 4). The interaction became physical. (JCSMF ¶ 18). Eventually, Officer Otundo and two members of the Hudson County Sherriff's Department placed Faragalla under arrest. (*Id.*). Plaintiff was eventually brought to the Jersey City Medical Center, where he complained of various injuries. (*Id.* ¶ 19).

These basic facts are undisputed. The parties disagree considerably, however, as to the appropriateness of Otundo's actions and the severity of Faragalla's injuries.

---

[1]   For purposes of this motion, I consider Defendant City of Jersey City's statement of material facts ("JCSMF") (DE 33-2 at 3-7), Defendant Morton Otundo's statement of material facts ("MOSMF") (DE 34-2), Plaintiff Samy Faragalla's supplemental statement of material facts ("PSSMF") (DE 39 at 8-14), as well as the deposition testimony and documentary evidence. Facts not contested are assumed to be true.

Record items cited repeatedly will be abbreviated as follows:

Pl. Opp. = Plaintiff Samy Faragalla's brief in opposition to the defendants' motion (DE 39)

Otundo Br. = Defendant Morton Otundo's brief in support of summary judgment (DE 34-1)

JC Br. = Defendant City of Jersey City's brief in support of summary judgment (DE 33-2)

Otundo Reply Br. = Defendant Morton Otundo's reply brief (DE 41)

JC Reply Br. = Defendant City of Jersey City's reply brief (DE 40)

[2]   Plaintiff does not dispute that the U-turn was illegal. He does, however, defend his conduct by stating that he did not see any signs prohibiting him from making a U-turn and that he had a client waiting in the opposite direction. (PSSMF ¶¶ 2, 3).

According to Faragalla, Officer Otundo unreasonably escalated an otherwise peaceful interaction. Faragalla had been cooperating during the traffic stop by giving Otundo his paperwork as requested. (PSSMF ¶ 5). Because he had a client waiting for him, he asked Otundo to issue him a ticket and let him be on his way. (*Id.* ¶ 6). To this, Otundo responded, "who the [expletive] do you think you are?", insisted that he was under arrest, pulled him out of the car by his right shoulder and threw him to the ground. (*Id.* ¶ 7). Plaintiff was further injured when his right shoulder hit the sidewalk, and when Otundo pulled on his arms to handcuff him. (*Id.* ¶ 8). Then, at the medical center, Plaintiff complained of pain in both of his shoulders resulting from the encounter. (*Id.* ¶ 9).

Officer Otundo does not dispute this basic version of the arrest, but maintains that his actions were nevertheless reasonable and that Plaintiff's alleged injuries cannot be attributed to him.[3] He claims that Faragalla only complained of pain in his neck, back left shoulder, and right hand when he visited the hospital immediately after the event. (MOSMF ¶ 13). Further, he notes that Plaintiff has been involved in a number of car accidents, and his most significant injury (to his right shoulder) results from one of those incidents, not from the arrest. (*Id.* ¶ 11-14).

Plaintiff filed a complaint against the City of Jersey City, Officer Otundo, and several others on May 19th, 2017. (DE 1). He raises the following causes of action:

1. Section 1983 Use of Excessive Force
2. Section 1983 Failure to Intervene
3. Section 1983 Jersey City Supervisory Liability
4. Section 1983 Hudson County Supervisory Liability
5. Section 1983 Jersey City Unlawful Policy, Custom, Practice, Inadequate Training
6. Section 1983 Hudson County Unlawful Policy, Custom, Practice, Inadequate Training

---

[3]   Otundo does imply that the encounter was not as described by Faragalla. For the purpose of this motion, however, he credits Faragalla's version of events, and argues that his alleged actions were nevertheless reasonable.

7.  Violation of New Jersey Civil Rights Act

8.  Assault and Battery

9.  Negligence

Hudson County and others were dismissed from the case on January 21st, 2020. (DE 32), removing Counts 4 and 6, which applied only to those dismissed parties. The City and Defendant Phillip Zacche (together, the "City Defendants") filed a motion for summary judgment on January 24th, 2020 (DE 33) and Defendant Otundo filed a motion for summary judgement that same day (DE 34). Plaintiff filed a brief in opposition (DE 39) to which both sets of moving defendants replied (DE 40, 41). These motions cover all of the remaining counts.[4]

For the reasons below, those motions for summary judgment are granted in part and denied in part.

## II. **Legal Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

---

[4]    Otundo moves for summary judgment on the second count, failure to intervene. In his opposition, Plaintiff states that he does not oppose the grant of summary judgment on that count. (Pl. Opp. at 1). Summary judgment is therefore granted.

Once the moving party has met the threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine issues of material fact exist). In deciding a motion for summary judgment, the court's role is not to evaluate and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.  Discussion

### A. Section 1983 Claims

Plaintiff's remaining Section 1983 claims purport to apply to Defendant Otundo individually and the City of Jersey City through a theory of municipal liability.[5]

#### 1. Governing Law

Section 1983 does not create a substantive right but instead provides a remedy for the violation of rights created by federal law.  42 U.S.C. § 1983; *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S. Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). A prima facie case under § 1983 requires a plaintiff to demonstrate that: (1) a person deprived him or her of a federal right; and (2) the person who deprived him or her of that right acted under color of state law. *Groman v. Twp. Of*

---

[5]     All of Faragalla's claims against the City are also levelled against Zacche, who is represented by the same counsel as the City. For convenience, all references to the City ought to be construed as references to Zacche as well.

*Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920, 1923 (1980)).

There is no issue as to the second element, *i.e.*, that the defendants have acted under color of state law; the individual defendants are a police officer and chief of police who were acting in the course of their official duties, and the City is a public entity. I therefore focus on the first element, *i.e.*, the deprivation of some right secured by the constitution. Here, the underlying deprivation is Otundo's alleged use of excessive force in arresting Plaintiff in violation of the Fourth Amendment.

### 2. Officer Otundo's Liability

### a. Applicability of the *Heck* Doctrine

Otundo argues that Plaintiff's Section 1983 claims are barred by the *Heck* doctrine, because Plaintiff pled guilty to criminal offenses related to the arrest in municipal court. (Otundo Br. at 12-13).

In *Heck v. Humphrey*, the Supreme Court held that a plaintiff may not recover damages under Section 1983 when doing so would invalidate a criminal conviction. 512 U.S. 477, 486-87 (1994); *see also Garrison v. Porch*, 376 F. App'x 274, 277 (3d Cir. 2010). But criminal convictions, or guilty pleas, do not necessarily preclude Section 1983 claims. For example, the Third Circuit has held "that a conviction for resisting arrest does not necessarily preclude an arrestee for recovering damages on a Section 1983 excessive force claim." *Garrison,* 376 F. App'x at 277 (citing *Nelson v. Jashurek*, 109 F. 3d 142, 145-46 (3d Cir. 1997)). The reasoning is that an officer might still have used an unreasonable amount of force in subduing a resisting arrestee. *Id.* Such a conclusion would not necessarily invalidate the underlying conviction.

Otundo relies primarily on *Bustamante v. Borough of Paramus*, 994 A. 2d 573, 584-586 (N.J. Super. Ct. App. Div. 2010). That case surveyed the applicability of the *Heck* doctrine, concluding that a Section 1983 excessive force claim was not always precluded by a guilty plea for resisting arrest. *Id.* at 586. The court still found, however, that it did preclude the plaintiff's claim in that

instance. In pleading guilty, the plaintiff "forfeited any claim that defendants used excessive force in effecting his arrest." *Id.* at 585. This conclusion was based on the elements of a plea for resisting arrest, which implied, to the court, that the plaintiff was admitting the officers made a lawful arrest.

Otundo's argument seems to be that because he arrested Faragalla for conduct that Faragalla ultimately pled guilty to, his actions must have been lawful. (Otundo Reply Br. at 5). The Section 1983 claims, he argues, amount to a finding that Otundo's actions were unlawful, which would be prohibited by the *Heck* doctrine. That is too broad a principle. Faragalla raises an excessive force claim against Otundo. For example, the existence of probable cause to arrest a suspect does not preclude the possibility that the officers used excessive force in doing so. So even a lawful arrest may involve excessive force for Section 1983 purposes.

This case does not, however, require a detailed analysis of whether an excessive force claim would invalidate an element of a criminal conviction. For the *Heck* doctrine to apply, a criminal conviction would have to be at risk of being invalidated by a civil action. The record here does not reflect any such criminal conviction. It is unclear from the record what Faragalla pled guilty to. While he was charged with resisting arrest and assaulting an officer, there is no evidence that he pled guilty to that offense. At most, Faragalla admits in his deposition that he pled guilty to *something*, probably to a motor vehicle offense, but could not remember which offense specifically. Faragalla Dep. 106:22-24; 139:12-14. These vague references in the deposition are the only evidence Otundo points to regarding criminal convictions.[6]

---

[6]     In his reply brief, Otundo draws the Court's attention to a statement in Plaintiff's opposition brief: "Plaintiff was charged with Resisting Arrest, Assaulting an Officer and motor vehicle summonses, all of which were resolved by Plaintiff pleading guilty in municipal court." (Pl. Opp. at 5). Otundo seems to take this to mean that Plaintiff admits he pled guilty to all of those charges. First, statements in a brief are not evidence. Second, taking inferences in the Plaintiff's favor, this admittedly ambiguous sentence could instead mean that the charges were all *resolved* by Faragalla's plea, not that he pled guilty to all. That interpretation is more likely to be true, considering that only a few sentences later Plaintiff argues that he was not resisting arrest. (Pl. Opp. at 6). Further,

Without knowing what criminal convictions exist, or what admissions were made in connection with the convictions, it cannot be concluded at this stage that a criminal conviction would be invalidated by Section 1983 damages. The *Heck* doctrine accordingly has not been implicated. Summary judgment will not be granted on that basis.

### b. Excessive Force

An excessive force claim is analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]o state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citation omitted). "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." *See Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006) (citations omitted). The relevant inquiry is "whether the officer's actions are 'objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citations omitted).

The Third Circuit has enumerated some relevant considerations:

In deciding whether challenged conduct constitutes excessive force, a court must determine the objective 'reasonableness' of the challenge conduct, considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Carswell*, 381 F.3d at 240 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). Other factors include "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). In evaluating reasonableness, the court must take into consideration the fact that

---

Plaintiff states in his deposition that he pled guilty to the motor vehicle violations. (Faragalla Dep. 106:22-24). The fact remains that it cannot be determined at this juncture that Faragalla pled guilty to resisting arrest or assaulting an officer.

> "police officers are often faced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. Thus, the court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer on the scene." *Id.* at 396, 109 S.Ct. 1865.

*Couden v. Duffy*, 446 F.3d 483, 496-97 (3d Cir. 2006).

Otundo argues that his actions, even when viewed in the light most favorable to Plaintiff, were objectively reasonable under the circumstances. Plaintiff took an illegal U-turn and "did not pay attention" to the officers' instructions. (Otundo Brf. at 7-8). Otundo says the amount of force allegedly to effectuate the arrest was reasonable.

Plaintiff, on the other hand, contends that triable issues of fact exist as to whether Otundo's conduct was reasonable. He delineates several factors of the analysis. As to the severity of the crime at issue, he admits that he was charged with resisting arrest, assaulting an officer, and motor vehicle summons, all of which were "resolved" by a guilty plea. (Pl. Opp. at 5). As to the duration of the action, Plaintiff appears to accept Otundo's contention that "it took approximately one minute to arrest Plaintiff" and that it took "a few seconds" to get Plaintiff's hands behind his back and apply handcuffs. (*Id.*). As to the number of persons the officers must contend with, Plaintiff explains he was the only person involved. (*Id.*).

As to whether the plaintiff posed any threat to the safety of the officers or may have been armed, Faragalla argues that he posed no threat, and never yelled, cursed, made any threatening statement, or tried to punch anyone. Nor was he actively resisting arrest: "Plaintiff was not resisting arrest or trying to flee. As is evident in the testimony of Plaintiff, he never had a chance to resist arrest." (Pl. Opp. at 6).

Plaintiff explains the use of force as follows:

> After asking Defendant Otundo to issue him a ticket and let him go so he could pick up his client, Defendant Otundo asked Plaintiff "who the [expletive] do you think you are?" told him that he was under arrest, grabbed him out of the car by his right shoulder and threw

him to the ground. Plaintiff's right shoulder hit the sidewalk when
Defendant Otundo threw him to the ground and Defendant Otundo
pulled on Plaintiff's arms when he handcuffed him.[7]

(Pl. Opp. at 6).

Otundo seems to argue that because Plaintiff "spoke loudly enough in
voicing his complaints through his window that Officer Otundo could hear
him several feet away from the back of the vehicle" and "while the officers
were talking to him he did not pay attention" Otundo was entitled to use
physical force. (Otundo Br. at 8-9).[8] For Otundo, the fact that he did not use
a weapon or continue to use force against Faragalla after he had been
subdued makes his actions objectively reasonable.

Altogether, Otundo contends that he was (or rather would have been)
justified in pulling Plaintiff from his vehicle, throwing him to the ground,
and handcuffing him, all in response to a routine traffic violation. Otundo
argues that his use of force was limited and appropriate. He is correct that
the use of force was limited and did not continue beyond handcuffing, but
there does not appear to be a reason why, crediting Faragalla's account, he
used any force at all. There is no indication, from Faragalla's account, that
Otundo was in any danger or that Plaintiff was refusing to cooperate.

---

[7]      This version of events, however, is somewhat inconsistent with Plaintiff's own
deposition testimony. According to Plaintiff's deposition, after he asked Officer Otundo if
he was going to be given a ticket, Otundo replied that Plaintiff was under arrest.
(Faragalla Dep. 80:6-16). Then, Faragalla opened the door to his car and stepped out.
(Faragalla Dep. 81:4-6). While he was exiting the car, Otundo grabbed him and punched
him in the chest. (81:7-82:4). Then he pushed Plaintiff back into the car before throwing
him to the ground. (82:16-25). After that, Plaintiff felt himself being kicked, but could not
see who was kicking him. (82:7-10). While Plaintiff was on the ground, Otundo grabbed
his right hand to handcuff him, all the while Plaintiff was protesting that he had surgery
on his shoulder and was injured. (88:4-18). Otundo continued to kick him. (88:19-89:6).

Nevertheless, for purposes of this summary judgment motion, I will consider Plaintiff's
version of events as explicated in the statement of material facts submitted alongside his
opposition brief.

[8]      Otundo also argues that he "had an objectively reasonable basis to arrest the
Plaintiff for his illegal, criminal conduct." (Otundo Br. at 8). He does not, however, offer
any authority for that claim. In any event, even if Otundo was entitled to arrest Faragalla,
he was not entitled to effectuate that arrest using excessive force.

I will now analyze the *Graham* factors. The first *Graham* factor is the severity of the crime. Here, the crime was an illegal U-turn—a minor traffic offense. True, Faragalla was charged with the crime of assaulting an officer and resisting arrest, but, as discussed above, there is no evidence he was convicted of those crimes. (And it begs the disputed factual question of why and how an illegal U-turn gave rise to an arrest scenario at all.) A reasonable jury could still find that this factor weighs in favor of Faragalla.

As to the second *Graham* factor—whether Faragalla posed an immediate threat to the officers—in Faragalla's version of events, he was sitting inside his car without any weapons when the use of force began. Otundo asked him to step out of the car and then immediately started to forcibly subdue him. (Faragalla Dep. 81:1-18; 128:2-21). A reasonable jury could conclude that this factor weighs in Faragalla's favor.

The third *Graham* factor—whether Faragalla was actively resisting arrest or attempting to evade arrest by flight. Taking Plaintiff's version, he was not resisting arrest, and the use of force began immediately after he complied with Otundo's instruction to get out of his vehicle. A reasonable jury could find that this factor weighs in Faragalla's favor.

Viewing the facts in the light most favorable to Plaintiff, Otundo used a significant amount of force against an unarmed individual sitting in his car, not presenting a danger, and cooperating while being charged with a minor traffic offense. Supported by multiple officers against a single individual, he tackled Faragalla to the ground and applied handcuffs. A reasonable jury might or might not conclude that his use of force under these circumstances was excessive. Summary judgment on the excessive force claim is therefore denied.

### c. Qualified Immunity

Otundo also argues that he is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When properly applied, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Medley v. Briggs,* 475 U.S. 335, 341 (1986). To overcome qualified immunity, a plaintiff must plead facts sufficient to show that: (1) the official violated a statutory or constitutional right; and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232; *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 168-69 (3d Cir. 2016). A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). The burden of proving the affirmative defense of qualified immunity rests on the party seeking to invoke it. *See Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006).

Having determined that a reasonable jury could conclude that the officer's conduct was not "objectively reasonable," I turn to whether it was "clearly established" that pulling Faragalla out of the car and tackling him to the ground to handcuff him in the course of ticketing him for a traffic violation violated the Fourth Amendment.

With respect to the second step of a qualified immunity analysis, this Court must "identify the right at issue and determine if that right was clearly established at the time of the officer's action." *Estep v. Mackey*, 639 F. App'x 870, 873 (3d Cir. 2016). A right is clearly established where, at the time of the challenged conduct, the contours of the right are "sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). In other words, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

While a case directly on point is not required, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). "Such precedent must come either from the Supreme Court or a 'robust consensus of cases of persuasive authority in the Court of Appeals.'" *In Re: J & S Properties, LLC*, No. 16–3366, 2017 WL 4294065, at *4 (3d Cir. Sept. 28, 2017) (quoting *Mammaro*, 814 F.3d 169).

In determining whether a constitutional right has been clearly established, the Court must "define the right allegedly violated at the appropriate level of specificity." *Sharp*, 669 F.3d 144, 159 (3d Cir. 2012) (citation omitted). Both the Supreme Court and the Third Circuit have repeatedly instructed courts "not to define clearly established law at a high level of generality." *al–Kidd*, 563 U.S. at 742 (citations omitted). "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition.'" *Mackey*, 639 F. App'x at 873 (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)). Within the context of excessive force claims specifically, both the Supreme Court and Third Circuit have emphasized the importance of defining with particularity the clearly established law. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (observing that the qualified immunity analysis "has more particularized requirements in an excessive force case").

I define the allegedly violated right as follows: Faragalla had the right not to be pulled from his car, tackled to the ground, and handcuffed during a routine traffic stop during which he was fully cooperative and the officer had no reason to suspect he was dangerous.

That right was clearly established at the time of the incident. The Third Circuit held in *Pratt v. Port Authority of New York and New Jersey* that force was excessive where the plaintiff "did not resist [the police officer] in any way, was

unarmed, and had committed, if anything, a relatively minor offense, yet [the officer] tackled him, face-first, onto the ground, twisting his neck on the way down, and causing him serious and permanent spinal injuries." 563 F. App'x 132, 135 (3d Cir. 2014). While Faragalla's injuries were not as significant as those of that plaintiff, the lead up to the tackling followed a similar pattern.

The Third Circuit also found excessive force when police officers, seeking to arrest a plaintiff pursuant to a warrant for a non-violent offense, dragged him out of his bed, pointed guns at him, and violently slammed him against a wall. *Ansell v. Ross Twp., Penn.*, 419 F. App'x 209, 213 (3d Cir. 2011).

Courts in other circuits have echoed the Third Circuit in holding that tackling unarmed and non-dangerous suspects constitutes excessive force. *Crawford v. Geiger*, 656 F. App'x 190, 204 (6th Cir. 2016) (holding more broadly that "'the right to be free from physical force when one is not resisting the police' was clearly established") (quoting *Wyson v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)); *Aguilar v. Robertson*, 512 F. App'x 444, 450 (5th Cir. 2013) ("All reasonable officers would have known in the circumstances of someone completely stopped on a motorcycle for speeding, who was not resisting arrest, who had neither committed nor threatened any crime besides the speeding, that tackling the rider and forcing him to the ground would violate a constitutional right."). *Malory v. Whiting*, 489 F. App'x 78, 86 (6th Cir. 2012) (holding that an "obvious legal norm prohibited [police officers] from tackling a suspect who made only a mild show of resistance, pressing his head into the ground, and punching him."); *Raiche v. Pietroski*, 623 F. 3d 30, 39 (1st Cir. 2010) (holding that "tackling a person [on a motorcycle] who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness" would be a "major departure from reasonable behavior" under the *Graham* factors).

These cases all demonstrate that the use of significant force, such as tackling, is unreasonable as applied to cooperative, non-resisting individuals who are not suspected of a serious crime or present danger. Indeed, The Third Circuit has recently held that a very similar right was clearly established at the time, even

14

for individuals who are uncooperative. *See El v. City of Pittsburgh*, __ F. 3d __, No. 18-2856, 2020 WL 5541155 (3d Cir. 2020) In *El*, the court determined that a consensus existed that an "unarmed, uncooperative citizen[] who [was] not suspected of serious crimes" had the right "not to be taken to the ground during an investigatory stop when he stands up and takes one or two small steps towards a police officer who is standing a few feet away." *Id.* at *8.

Unlike the plaintiff in *El*, Faragalla was not uncooperative[9]. If a reasonable officer ought to have known that an uncooperative citizen in a similar situation has the right not to be tackled to the ground, it follows *a fortiori* that a reasonable officer ought to have known a cooperative citizen has that same right. Because Faragalla's right was clearly established at the time of the incident, Otundo is not entitled to qualified immunity, and summary judgment will not be granted on that basis.

### 3. Municipal Liability

Plaintiff's Section 1983 claims are also asserted against the City Defendants. Municipalities and local governments cannot be held liable under Section 1983 on a *respondeat superior* theory, but may be held liable for a constitutional injury that resulted from a policy or custom the local government body has adopted. *See Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). The "official policy" requirement in *Monell* "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible"—acts, in other words, which municipality "has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S. Ct. 1292, 1298 (1986) (emphasis in original).

---

[9]      I am viewing the facts in Faragalla's favor, as is required at this stage. A jury, of course, could ultimately conclude that Faragalla was uncooperative, or even combative.

In order to establish a prima facie case for *Monell* liability, the Plaintiff must "(i) demonstrate the existence of an unlawful policy or custom; (ii) that resulted in a deprivation of the rights, privileges, or immunities secured by the Constitution or laws of the United States; and (iii) that the policy or custom was the proximate cause of the alleged deprivation." *Maldonado v. City of Passaic Bd. Of Educ.*, No. CV1712245ESJAD, 2020 WL 289649, at *7 (D.N.J. Jan. 21, 2020) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A government policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Bielevicz*, 915 F.2d 845, 850 (3d Cir. 1990)). In contrast, "a course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Id.*

Plaintiff asserts *Monell* liability for the City in Count 3 (Section 1983 Jersey City Supervisory Liability) and Count 4 (Section 1983 Jersey City Unlawful Policy, Custom, Practice[,] Inadequate Training). These counts appear to correspond to two recognized theories of *Monell* liability: (1) unconstitutional policies and customs, and (2) inadequate training of employees.

### a. Unconstitutional Policies and Customs

The City Defendants argue that Plaintiff has failed to bring forth evidence of any existing policies or customs that could be linked to Otundo's use of excessive force. (JC Br. at 18). Plaintiff relies on the fact that the City did not follow guidelines promulgated by the New Jersey Attorney General's office regarding internal affairs investigations (the "Guidelines"). This failure, Plaintiff argues, constituted a custom tolerating the use of excessive force.

Faragalla claims that despite the City's stated policy that civil complaints trigger internal affairs investigations, the department failed to actually conduct interviews, revealing that the policies are a sham. He cites to *Beck v. City of Pittsburgh*, 89 F. 3d 966 (3d Cir. 1996). In that case, the Third Circuit held that the existence of policies to prevent wrongdoing is not enough when there is

evidence that the policies are a mere façade. *Id.* at 974. There, the police department did not formally track complaints against individual officers. *Id.* at 969. Prior complaints of excessive force had no bearing on pending investigations; indeed, the plaintiff introduced evidence of four previous excessive force complaints against one of the officers in question. *Id.* at 969-970. The Third Circuit required that investigations be adequate to protect civilians from excessive force, whereas the police department's policies in that case served only to "curtail disciplinary action." *Id.* "A jury readily could have found the Office of Professional Standards was nothing more than a façade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescing in the excessive use of force by its police officers." *Id.*

Plaintiff also cites a discussion of the adequacy of investigative procedures in *Monaco v. Camden*. There, the plaintiff argued that the police department did not properly investigate his excessive force complaint. No. 04-cv-408423, 2008 WL 408423 (D.N.J. Feb. 13, 2008). Despite the police department's awareness of plaintiff's allegations shortly after the incident occurred, it did not investigate until almost three years later. *Id.* at *13. When the investigation did occur, the internal affairs detective only asked for the officers involved to write a report of their account of the events. *Id.* at *14. The reports yielded ambiguous results. Still, the detective did not follow up with the officers or plaintiff, simply concluding that plaintiff's allegations were "not sustained." *Id.*

The record in *Monaco* reflected further evidence that this kind of investigation was typical and reflected the police department's policy. The detective's "exclusive reliance upon the contents of the officers' reports, and her decision not to seek to resolve the ambiguity of the information gleaned in the investigations, was not an accidental oversight in this particular case, but was, instead, as she testified, 'the way that we do it.'" *Id.*  From this, the court found as follows:

> "[A] reasonable jury could find, based on the evidence in the record, that it was the 'well settled' custom of the City and the Police

17

Department not only to fail to conduct timely investigations into allegations of excessive force, but that when such investigations were ultimately performed, they were directed less toward detecting and correcting misconduct than toward shoring up the Department's and the officer's defenses. A jury could reasonably find that such inattention to the question of whether police misconduct actually occurred was 'so likely to result in the violation of constitutional rights' as to evidence the City's deliberate indifference to its officers' use of excessive force. There is, moreover, a strong 'connection between the … [allegedly inadequate policy identified] and the specific constitutional violation' Plaintiff alleges took place."

*Id.* (citation omitted) (alteration in original) (quoting *Board of County Com'rs of Bryan County, Okl. V. Brown*, 520 U.S. 397, 412 (1997).

Faragalla has not demonstrated such a pattern here. To begin with, failure to adhere to the Guidelines, even a routine failure, does not necessarily equate to an unconstitutional policy or custom. But in any event, Faragalla has not provided a sufficient basis for an inference that the City Defendants did in fact routinely fail to adhere to the Guidelines. He points to only two items of record evidence: (1) that Otundo stated he was not interviewed by internal affairs in connection with Plaintiff's complaint[10] and (2) that a subsequent excessive force complaint was filed against Otundo a year later.

Those two facts are not enough to allow an inference that there is a well-settled policy of indifference to the Guidelines, or more broadly to complaints of excessive force. Faragalla has only shown, at best, that the City Defendants failed to interview the officer involved in this one instance. Accepting the somewhat

---

[10]     Plaintiff does not cite to the record for this proposition, but it appears to come from Defendant Otundo's interrogatory answer:

Q: Please state whether you were ever questioned by any police supervisors conducting any Internal Affairs and/or Administrative investigation pertaining to Plaintiff's arrest.

A: Objection. This interrogatory is overbroad, ambiguous and unduly burdensome. Notwithstanding said objection, and without waiver thereof, Defendant submitted a written report, and is without knowledge regarding any internal affairs investigation.

DE 39-1 at 24.

problematic theory that the subsequent complaint is evidence that the police department did not take Plaintiff's complaint against Otundo seriously enough, there is no indication that the City Defendants did not investigate that subsequent complaint. Nor is there evidence that the police department regularly minimizes the effectiveness of its internal affairs review process. To establish a custom, there must be a "course of conduct." *Jiminez v. All American Rathskeller, Inc.*, 503 F. 3d 247, 250 (3d Cir. 2007). An isolated example is not a course of conduct.

Faragalla has not demonstrated anything close to the pervasive misconduct demonstrated by the record in *Beck* and *Monaco*. Those cases both reflected multiple examples of misconduct by the police department defendants and a consistent pattern of failing to properly investigate excessive force complaints. Faragalla has not provided evidence of such a pattern here. The evidence in the record is therefore insufficient to raise a triable dispute of fact as to whether the City Defendants engaged in a policy or custom of ignoring excessive force complaints that led to the deprivation of Faragalla's constitutional rights. Accordingly, summary judgment is granted in favor of the City Defendants as to this theory.

### b. Inadequate Training

Inadequate police training may serve as the basis for municipal liability under Section 1983, but only where the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The deliberate indifference standard is a demanding one, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 131 (2011).

To establish a claim of municipal liability under a failure-to-train theory, the plaintiff must show that the deficient training of officers is closely related to the injury he ultimately suffered. *City of Canton*, 489 U.S. at 391. The focus of this inquiry "must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390. Thus the flaw must be in the

training program itself; isolated errors in its execution will not suffice. Liability will not arise merely because an otherwise acceptable training program has been negligently administered. *Id.* at 391. Nor will liability arise on the tautological grounds that the injury in question would not have occurred if officers had been trained to avoid that particular injury; such a claim "could be made about almost any encounter resulting in injury." *Id.* at 391. Additionally, the plaintiff must show that the failure to train "reflects a deliberate or conscious choice" by the municipality. *Id.* at 389. In short, the plaintiff's task here is two-fold: he must show that the City's training program was insufficient, and that the insufficiency resulted from an intentional decision by the City.

Plaintiff does not point to any evidence about the City's police training program. After reciting the elements of a claim based on a failure to train theory, he states that "Plaintiff's case and the subsequent *Sanders* excessive force lawsuit filed against Defendant Otundo resulting in no disciplinary action or retraining show that Defendants Jersey City, Chief of Police Zacche and other supervisors are aware of Defendant's 'unfitness, incompetence' and 'dangerous attributes.'" (Pl. Opp. at 16-17). Plaintiff presents no facts about the training program or its flaws. Nor does he present evidence that any failure to train on the subject of excessive force was an intentional decision by the police department. His conclusory denunciation is insufficient to create an issue of fact.

Accordingly, summary judgment is granted in favor of the City Defendants as to the inadequate training theory of liability.

### B. NJCRA Claim

In Count 7, Faragalla brings a claim that Otundo violated the New Jersey Civil Rights Act ("NJCRA") by using excessive force against him.

The NJCRA, N.J. Stat. Ann. § 10:6-2(c), provides that "[a]ny person who has been deprived of any substantive rights, privileges or immunities secured by the Constitution or laws of this State by a person acting under color of law, may bring a civil action for damages."

The New Jersey State Legislature, when it enacted the NJCRA, intended it to parallel 42 U.S.C. § 1983, and sought to incorporate existing § 1983

jurisprudence. *Perez v. Zagami*, 218 N.J. 502, 515, 94 A. 3d 869 (2014); *see also Ramos v. Flowers*, 429 N.J. Super. 13, 23, 56 A. 3d 869 (App. Div. 2012) (stating that NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights." (citations omitted)); *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). Thus, the NJCRA is construed nearly identically to Section 1983.

Otundo argues that the NJCRA claim must be dismissed because he is protected by qualified immunity. Because, as discussed above, Otundo is not entitled to qualified immunity under Section 1983, summary judgment as to the NJCRA claim is denied as well.

### C. State Law Claims

Plaintiff also brings claims of assault and battery (Count 8) and negligence (Count 9). These claims are brought against Otundo directly and against the City Defendants through a theory of *respondeat superior*. Defendants argue that they are not liable for these torts, and that damages for pain and suffering are barred by the New Jersey Tort Claims Act.

#### 1. Damages for Pain and Suffering

The New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1-1, *et seq.* limits a plaintiff's ability to recover from public entities and employees. N.J. Stat. Ann. 59:9-2(d) provides that "[n]o damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00."

Defendants each argue that Plaintiff has provided no evidence that his injuries resulted in permanent loss of bodily function.[11] Plaintiff argues that he

---

[11]    Defendants also argue throughout that Plaintiff's injuries do not arise from his encounter with Officer Otundo, but are instead a result of multiple other car accidents. Both of his treating physicians, however, concluded "within a reasonable degree of

has, relying on the opinion evidence of two treating physicians that his shoulder injury is permanent in nature.

New Jersey courts have provided guidance in interpreting the statutory prohibition against pain and suffering damages. In *Brooks v. Odom*, the New Jersey Supreme Court examined the legislative intent of the statute and concluded that the plaintiff, who suffered from permanent limitations of motion in her neck and back, had not sustained permanent loss of bodily function within the meaning of the statute. 150 N.J. 395, 406, 696 A. 2d 619 (1997). The court relied in part on the fact that, despite her permanent injuries, she could still "function both in her employment and as a homemaker." *Id.*

The court expanded on this holding in *Gilhooley v. County of Union*, reading *Brooks* as requiring that the objective evidence must show a permanent loss of bodily function that is also "substantial." 164 N.J. 533, 541, 753 A. 2d 1137 (2000). Critically, the court held that not every objectively permanent injury is necessarily "substantial." *Id.*

This substantiality prong was again at issue in *Kahrar v. Borough of Wallington.* 171 N.J. 3, 791 A. 2d 197 (2002). There, although the plaintiff was able to return to work after surgery, her range of motion in her shoulder was permanently reduced by 40%. This significant injury, which required open surgery and implicated the essential functioning of the arm, qualified as substantial. *Id.* at 15-16. The court also expressly denied that *Brooks* invented a *per se* rule that recovery is barred where the plaintiff can still "function reasonably well at work and at home, irrespective of the nature or degree of permanent impairment." *Id.* at 14.

In interpreting this guidance, some New Jersey courts have sought to compare the severity of a plaintiff's injury to that of the plaintiffs in the above

---

medical probability" that his injuries were causally related to the arrest. (PSSMF ¶¶ 18, 21). Causation is ultimately a factual question for the jury, and at this stage, I make the inference in Plaintiff's favor that the injuries he complains of were in fact caused by his encounter with the police. *See Verdi*, 2012 WL 5041169, at *7 (holding that it was error for the trial court to resolve the question of whether a subsequent fall was the cause of plaintiff's injuries at the summary judgment stage).

cases. *See, e.g.*, *Verdi v. Borough of Hopatcong*, No. A-2439-11T1, 2012 WL 5041169, at *7 (N.J. Super. Ct. App. Div. Oct. 19, 2012) ("Plaintiff's persisting arm injury in this case is sufficiently comparable to the arm injury in *Kahrar* to be presented to a jury."); *Heenan v. Greene*, 809 A. 2d 836, 840 (N.J. Super. Ct. App. Div. 2002). In *Heenan*, for example, the court was faced with a plaintiff who had suffered a permanent spine injury. 809 A. 2d at 836. Nevertheless, the court concluded that the plaintiff had not sustained as substantial an injury as the plaintiffs in *Gilhooley* and *Kahrar*.[12] *Id.* at 840. The plaintiffs in those cases, the court reasoned, had "sustained injuries that would have rendered an extremity useless without significant surgical intervention." *Id.* The plaintiff in *Heenan*, on the other hand, experienced "some restriction of movement" but was still able to play sports, perform household chores "to some extent" and continue in her employment. *Id.* Her injuries, therefore, were more analogous to those of the plaintiff in *Brooks*, which were adjudged insubstantial. *Id.*

Faragalla claims that his injuries meet the standard. He provides purportedly objective medical evidence in the form of opinions from two treating physicians.[13] Dr. Garfinkel diagnosed him with a torn labrum and torn rotator cuff in his right shoulder and concluded "within a reasonable degree of medical probability" that the injuries were permanent in nature. (PSSMF ¶¶ 17, 18). Dr. Eid described limited cervical and lumbar range of motion, an L5-S1 herniation, and an exacerbation of a prior L4-5 disc bulge. He, too, concluded "within a reasonable degree of medical probability" that these injuries were permanent in nature. (PSSMF ¶¶ 20, 21).

Faragalla points to these two opinions, both concluding the injuries are "permanent," as evidence that his injuries meet the statutory standard. This showing is insufficient to meet the statutory standard. *Gilhooley* expressly held

---

[12]    The court also compared the plaintiff's injury to that of the plaintiff in another Appellate Division case, *Gerber v. Springfield Bd. of Educ.*, 328 N.J. Super. 24, 744 A. 2d 670 (App. Div. 2000).

[13]    The City Defendants also argue that these physician opinions violate the net opinion rule and cannot be considered by the Court. Because I find that there is insufficient evidence even including the physician's opinions, I do not reach that issue.

that mere permanence is not enough. The permanent injuries must also be substantial. Faragalla does not provide any evidence that his injuries are substantial within the meaning of the statute.

On the contrary, although Plaintiff does not specifically reference any evidence other than his physicians' opinions, the record reflects that his injuries are of a similar nature as those of the plaintiffs in *Heenan* and *Brooks*. He missed several days of work to receive medical treatment. (Faragalla Dep. 62:3-11). While he previously used his right arm and shoulder to lift heavy luggage into his cab, he was subsequently forced to use his left arm and shoulder. (*Id.* 15-19). He also works fewer hours and takes breaks while driving. (*Id.* 65:1-15). He did ultimately receive surgery on his right shoulder in May of 2018. (*Id.* 54:4-6). The surgery, however, occurred almost two years after the incident with Officer Otundo and was only intended to ease pain, rather than rehabilitate an otherwise useless extremity. (*Id.* 53:23-54:3). And certain of his injuries and work difficulties are admittedly related to other, separate injuries, such as a left shoulder injury. (*Id.* 62:15-22). While Plaintiff testified that he still experienced shoulder pain, he admitted that he no longer goes to physical therapy. (*Id.* 56:3-14).

While no doubt painful and inconvenient, these injuries do not rise to the level of substantiality required to overcome the Tort Claims Act's bar. They do not render his arms "useless" without significant surgical intervention. He is still able to engage in his employment to some extent. He has not been significantly limited in his activities nor are his injuries of the same degree as those of the plaintiff in *Kahrar*. No reasonable jury, therefore, could find that Plaintiff has suffered a permanent loss of bodily function that is substantial. The difficulties Plaintiff experiences are ultimately insufficient to warrant tort damages for pain and suffering. To the extent Faragalla seeks those damages, they are barred.

### 2. Otundo's Liability

Otundo argues that Faragalla's assault and battery claim is barred by the New Jersey Tort Claims Act because, as discussed *supra*, he has not suffered permanent loss of bodily function. (Otundo Br. at 12-13). Otundo, however,

misquotes the applicable statute. N.J. Stat. Ann. § 59:9-2(d) does not prohibit liability in the absence of permanent loss of bodily function. It prohibits only damages for pain and suffering.

Otundo then argues that the assault and battery claim should be dismissed because his use of force against Faragalla was reasonable, and he was permitted to use reasonable force. (Otundo Br. at 13). As discussed *supra*, Faragalla has put forth evidence that Otundo used excessive force. Summary judgment on the assault and battery claim therefore cannot be granted to Otundo.

As for the negligence claim, Otundo argues that the Tort Claims Act provides immunity for police officers acting within the scope of employment. (Otundo Brf. at 13).[14] Faragalla responds that Otundo can be liable for negligence for breaching his duty of care.

The case cited by Otundo does not support general immunity for police officers acting within the scope of employment. Instead, it held more narrowly that a public employee "instituting or prosecuting any judicial or administrative proceeding within the scope of his employment" is immune from liability. *R.K. v. Y.A.L.E. Schools, Inc.*, 621 F. Supp. 2d 188, 200 (D.N.J. 2008) (quoting N.J. Stat. Ann. § 59:3-8). Public employees seeking to invoke immunity bear the burden of establishing that immunity. *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582, 969 A. 2d 1097 (2009). The movant must establish that his actions were objectively reasonable or that he performed them with subjective good faith. *Id.* (quoting *Canico v. Hurtado*, 144 N.J. 361, 365, 676 A. 2d 1083 (1996)).

Faragalla acknowledges this requirement in his opposition brief, citing N.J. Stat. Ann. § 59:2-10, which requires "malice, or willful misconduct" for liability. He then argues that the same facts showing Otundo used unreasonable and excessive force establish that his actions constituted malice and willful misconduct. (Pl. Opp. at 22). Otundo says they do not. (Otundo Reply Br. at 6). There exists here a genuine dispute. If a jury concluded that Otundo's actions

---

[14]     Otundo also seems to argue that he cannot be liable for negligence because his actions were objectively reasonable. That contention, however, presents issues of fact. *See* Section III.A.2, *supra*.

were reasonable, an inference could be made that he used force in good faith. I cannot reach such a conclusion on summary judgment, however. Summary judgment on the negligence claim is therefore denied.

### 3. City Defendants' Liability

The City Defendants argue that they cannot be held vicariously liable for intentional torts of a public employee. (JC Br. at 22-23). They also argue that assault and battery is outside the scope of employment[15] and that therefore the City is immunized from liability. (JC Br. at 23-24).

"A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2-10. Based on this statutory language, "there can be no vicarious liability by a public entity for intentional torts committed by its employees; that is, with respect to such intentional torts, the theory of respondeat superior does not apply." *Hoag v. Brown*, 397 N.J. Super. 34, 54, 935 A. 2d 1218 (App. Div. 2007).

The City Defendants seek to complete the syllogism by claiming that assault and battery is an intentional tort. That is, any finding that Otundo committed assault and/or battery would have to be predicated on a conclusion that he engaged in willful misconduct. As a suggestive, but hardly on-point, case cited by the City Defendants held, that is not a necessary conclusion:

> Insofar as the assault and battery claim was based upon a theory that Fortier acted *negligently*, the trial judge recognized that Kelly had pursued a workers' compensation claim for his alleged injuries and,

---

[15]    The City Defendants are inconsistent in their position as to whether Otundo was acting within the scope of employment. In committing assault and battery, they argue he was acting outside of the scope of his employment, which is to "uphold the law." (JC Br. at 23). Elsewhere, they argue that "Plaintiff failed to show that the conduct of Officer Otundo was not rightfully within his scope of employment." (JC Br. at 21). Perhaps the City Defendants mean that Otundo was presumptively acting within the scope of his employment, but if he were found guilty of assault and battery, he necessarily could not have been acting within the scope of his employment.

Ultimately, their argument that they cannot be liable if Otundo acted outside of the scope of employment is attached to the argument that his misconduct was willful. That is, it must have been outside of the scope because it was willful. The City Defendants have not raised, therefore, an argument that Otundo acted outside of the scope of employment even if the assault and battery were merely negligent.

> thus, is precluded from pursuing a common law claim against [the
> defendant] for negligence occurring in the workplace. And, to the
> extent that Fortier's alleged actions could be viewed as *willful*, we
> conclude that the trial judge correctly held that the County and its
> Board of Chosen Freeholders could not be held liable because N.J.S.A.
> 59:2–10 immunizes public entities from suits based upon the willful
> acts and omissions of their employees.

*Kelly v. County of Monmouth*, 380 N.J. Super. 552, 558, 883 A. 2d 411 (App. Div. 2005) (citations omitted) (emphases in original).

The worker's compensation bar is not present here, but the *Kelly* holding opens up the possibility that not every incident of physical striking is willful misconduct. That being said, the facts of this case are starkly different from the facts of *Kelly*, which involved what the defendant argued was an accidental touching. *Id.* at 557.

Faragalla does not seem to suggest anything other than an intentional tort or willful misconduct. *See* Pl. Opp. at 22 ("The acts and omissions of Defendant Otundo . . . constitute malice and willful misconduct."). Although I am required to make reasonable inferences in favor of the non-movant at this stage, I must find that to the extent Plaintiff is arguing an intentional-tort theory of assault and battery, the City Defendants are immune from liability and summary judgment is granted in their favor.

Plaintiff does raise a negligence theory. *See* Compl., DE 1, at 15. As to that, the City Defendants make no arguments. Accordingly, summary judgment will not be granted on the negligence claim as to the City Defendants. Counsel are directed to confer, however, as to whether plaintiff truly intends to press a claim that the officer acted negligently.

## IV. Conclusion

For the reasons set forth above, Defendants' motions for summary judgment (DE 33, 34) are **GRANTED** as to Count 2 (Failure to Intervene), Count 3 (Section 1983 Jersey City Supervisory Liability), and Count 5 (Section 1983 Jersey City Unlawful Policy, Custom, Practice, Inadequate Training). Summary judgment is also granted (1) in favor of the Defendants as to whether Faragalla may recover damages for pain and suffering on his state tort claims and (2) in favor of the City Defendants as to a theory of intentional assault and/or battery, but not as to negligence.

The motions are otherwise **DENIED**.

Dated:  September 30, 2020

/s/ Kevin McNulty

_____

**HON. KEVIN MCNULTY, U.S.D.J.**

28